## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**ROBYN L. BURR,**                                    )
                                                      )          **Civil Action No.**
       **Plaintiff,**                            )          **18-12378-FDS**
                                                      )
       **v.**                                   )
                                                      )
**ANDREW SAUL, Commissioner,**                        )
**Social Security Administration,**                   )
                                                      )
       **Defendant.**                          )
_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
## FOR ORDER REVERSING THE COMMISSIONER'S DECISION

**SAYLOR, J.**

This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying an application for social security disability insurance ("SSDI") and

supplemental security income ("SSI") benefits. Plaintiff Robyn Burr alleges that she became

disabled on December 27, 2015, after various impairments worsened and rendered her unable to

work. She submitted medical records indicating that she suffers from various ailments, including

arthritis, degenerative joint disease of the knees, fibromyalgia, chronic obstructive pulmonary

disease ("COPD"), and asthma. She now disputes the Commissioner's holding that she is not

"disabled" within the meaning of the Social Security Act.

Pending before the Court is Burr's appeal and the Commissioner's motion to affirm. For

the reasons stated below, Burr's motion to reverse and remand will be granted and the

Commissioner's motion to affirm will be denied.

## I.     Background

The following is a summary of the relevant evidence in the administrative record ("A.R.").

### A.     Education and Occupational History

Robyn Burr was born on July 20, 1958, and is approximately 61 years old. (A.R. (Dkt. No. 13) at 108). She has completed high school and has attained both a college and master's degree. (*Id.* at 66-67, 301).

At the administrative hearing, Burr testified that she worked from approximately October 1988 to December 2009 as a seamstress (*id.* at 120); from approximately January 2001 to September 2005 as a full-time transcriptionist and/or data-entry clerk for State Farm Mutual Insurance (*id.* at 68, 119, 329); from approximately March 2006 to December 2008 as a computer-aided design ("CAD") designer and/or project document administrator for LPE Enterprises Ltd. and Custom Staffing (*id.* at 68-69, 119, 329); and from approximately July 2010 to March 2016 as a primary care attendant ("PCA") to her mother for Cerebral Palsy of Massachusetts, Inc. (now, Tempus Unlimited, Inc.) (*id.* at 67, 70, 119). [1] She has not worked since March 2016. (*Id.* at 300, 323, 328). [2]

### B.     Medical History

Burr alleges that she suffers from numerous impairments, including arthritis, fibromyalgia, degenerative joint disease of the hand, osteoarthritis of the knee, COPD, and asthma. (*Id.* at 137, 152, 350, 407-08).

---

[1] Burr alleges that on December 27, 2015, she reduced her work hours to ten hours per week and hired a neighbor to perform household tasks and errands she could no longer perform as a PCA. (A.R. at 322-23, 407). She also states that the income she was paid for the period from February 2 to 20, 2016, was in the form of sick pay. (*Id.* at 319, 321).

[2] Burr also testified that in July 2017 she was approved for Section 8 housing assistance. (*Id.* at 71-72).

On January 18, 2016, while she was still working, Burr saw Dr. Slawomir Pajak to follow up on prior diagnoses of proteinuria and fibromyositis. (*Id.* at 472). She reported "arthralgias/joint pain" and reported no muscle weakness, back pain, swelling in the extremities, fatigue, arm pain on exertion, shortness of breath, cough, wheezing, shooting pain, headache, dizziness, or depression. (*Id.* at 474). Dr. Pajak noted that she was a daily smoker, ambulated normally, and was "healthy-appearing, well-nourished, and well-developed." (*Id.* at 474-75). He also noted that she had no dyspnea, her breathing sounded normal, and she had good air movement. (*Id.* at 475). For her proteinuria, he recommended she take Lisinopril and avoid non-steroidal anti-inflammatory drugs (NSAIDs). (*Id.*). As to her fibromyositis, he noted that she experienced chronic left knee pain and was "stable on camphor patches" but did not tolerate Cymbalta because of sedative effects. (*Id.*).

On January 27, 2016, Burr saw Dr. Daniel Martin, her primary-care physician. (*Id.* at 516). He noted that she ambulated normally, she had no dyspnea, her breathing sounded normal, and she had good air movement. (*Id.* at 519). He assessed that she had asthma, for which he prescribed albuterol and Advair; hyperglycemia; and multiple nodules of the lung, which he noted were stable and produced no symptoms. (*Id.* at 519-520).

Spirometry testing from April 15, 2016, indicated mild obstructive pulmonary impairment, no restrictive ventilatory defect, and mild diffusion defect. (*Id.* at 513-15). The testing also suggested that Burr may not benefit from bronchodilator therapy. (*Id.* at 515).

During a follow-up visit with Dr. Martin on April 27, 2016, Burr reported a cough, wheezing, shortness of breath, foot and joint pain, chronic pain, and an inability to stand or sit for prolonged periods. (*Id.* at 499, 505, 508-09). She stated that her fibromyositis was "doing okay" but that her COPD worsened with activity. (*Id.* at 505). Dr. Martin noted that her

pulmonary nodules and emphysematous changes were stable and that she ambulated normally. (*Id.* at 506, 508). She had rhonchi sounds and diminished air movement. (*Id.* at 508). He assessed that she had COPD, hyperglycemia, multiple nodules of the lung (which were non-symptomatic), and joint pain in her hands, knees, and feet. (*Id.* at 508-09). For COPD, he prescribed albuterol and Advair, and noted that her respiratory symptoms included cough and dyspnea. (*Id.* at 508, 510).[3] For joint pain, he referred her to an orthopedist for a gel injection. (*Id.* at 509).

On May 20, 2016, Burr saw Dr. Edward Klein for knee pain. (*Id.* at 722). She reported pain in both knees, beginning in November 2015, and that the pain was worse on the left. (*Id.*). She reported that the pain was occasional, of moderate severity, minimally improved by ice, improved by elevation, temporarily relieved by patches, and aggravated by long periods of activity. (*Id.*). A cortisone injection from November 2015 also relieved the pain, but for only two months. (*Id.* at 723). She reported no weakness, numbness, tingling, swelling, catching/locking, popping/clicking, instability, or radiation down her leg. (*Id.*). Dr. Klein determined from a physical examination that she had normal flexion and extension strength in both legs and no laxity or ligamentous instability. (*Id.* at 725). Neither knee had any deformity, mass, warmth, erythema, or abnormal axial alignment. (*Id.*). Her left knee, however, had moderate tenderness along the medial joint line and mild swelling. (*Id.*). Dr. Klein assessed that she had derangement of the left knee. (*Id.*). Based on an x-ray, he concluded that there were no signs of arthritis but that she appeared to have a meniscal tear on her left knee. (*Id.*). He referred her for an MRI. (*Id.*).

On June 16, 2016, Burr saw Dr. Michael Egan to follow up on her knee osteoarthritis and

---

[3] There appears to be a discrepancy in Dr. Martin's notes. In his notes on his physical examination of Burr's lungs and respiratory effort, he noted that there was no dyspnea. (A.R. at 508).

fibromyalgia. (*Id.* at 558). She reported pain when sitting and in her lower back, tailbone, hands, wrists, neck, and knee. (*Id.* at 561). She also reported that she was in physical therapy and that she used a knee brace. (*Id.*). She reported no exercise intolerance, fatigue, cough, wheezing, shortness of breath, weakness, or shooting pain. (*Id.*). Dr. Egan conducted a physical examination and found her to be "healthy-appearing, well-developed, and thin." (*Id.*) (emphasis omitted). She ambulated normally, had no dyspnea, breathed normally, and had good air movement. (*Id.*). She had normal motor strength and tone and no contractures, tenderness, or bony abnormalities in her joints, bones, or muscles. (*Id.*). She had bony swelling of the knee, limited range of motion of the lumbar spine, and tender range of motion of the cervical spine. (*Id.*). Dr. Egan assessed that she had osteoarthritis of the knee, fibromyalgia (which he noted was "still a problem" with "very limited" medication options), lower back pain, cervical spondylosis, and hand pain. (*Id.*).

On June 28, 2016, Burr saw Dr. Andrew Spongberg for ear discomfort. (*Id.* at 575). She reported fatigue, depression, anxiety, and that she occasionally felt a little unsteady. (*Id.* at 578-79). She reported no weakness, wheezing, dyspnea on exertion, shortness of breath, or cough. (*Id.*). Dr. Spongberg noted that her ear discomfort was probably related to her fibromyalgia. (*Id.*).

On September 9, 2016, Burr again saw Dr. Klein. (*Id.* at 718). She reported that the pain in her left knee had worsened due to physical therapy and had become severe. (*Id.* at 720). The pain was occasional, throbbing, and sharp. (*Id.*). It was aggravated by sitting, standing, lying down, walking, bending/squatting, weight-bearing, driving, moving from sitting to standing, and going upstairs or downstairs. (*Id.*). She also reported weakness, swelling, and radiation down the leg. (*Id.*). Dr. Klein determined that she had normal flexion and extension strength in both

legs and no laxity or ligamentous instability.  (*Id.* at 721).  Neither knee had any deformity, mass, warmth, or erythema.  (*Id.*).  Her left knee, however, had moderate tenderness along the medial joint line, mild swelling, and moderate pain at extreme limits of range of motion.  (*Id.*).  Dr. Klein again assessed that she had derangement of the left knee and noted that he still recommended an MRI.  (*Id.*).

On September 15, 2016, Burr had a follow-up appointment with Dr. Egan for knee osteoarthritis, cervical spondylosis, and pain in her hands and lower back.  (*Id.* at 733-34).  She reported that her hand and knee pain had worsened.  (*Id.* at 736).  She also reported exercise intolerance, muscle aches, and arthralgias/joint pain, but reported no fatigue, weakness, or shooting pain.  (*Id.*).  Dr. Egan noted that she appeared to be in moderate distress but "healthy-appearing, well-nourished, [] well-developed," and ambulated normally.  (*Id.*).  She had normal motor strength and tone and normal movement of her extremities.  (*Id.* at 737).  She had no contractures, tenderness, bony abnormalities, or abnormal movement of the extremities in her joints, bones, or muscles.  (*Id.*).  Dr. Egan observed that she had positive trigger points; left knee pain; and pain in, and limitation of, the lower back.  (*Id.*).  He assessed that she had degenerative joint disease of the hand, for which he recommended that she apply heat and gentle range of motion; derangement of the knee; and fibromyositis, which he noted remained active and for which medication treatment was limited.  (*Id.*).

On September 24, 2016, an MRI of Burr's left knee indicated medial and lateral tears, as well as "[s]ome degenerative intrasubstance signal . . . in the body of the medial meniscus."  (*Id.* at 738).

On October 5, 2016, Burr had a follow-up appointment with Dr. Klein for her knee pain.  (*Id.* at 713).  She reported left knee pain and total body pain, but reported no weakness,

numbness, swelling, catching/locking, popping/clicking, or instability. (*Id.* at 713-14). The pain was constant, of moderate severity, minimally improved by ice, and improved by elevation and rest. (*Id.* at 713-14). It was aggravated by walking, bending/squatting, range of motion, weight-bearing, getting out of bed, moving from sitting to standing, goings upstairs or downstairs, and nighttime. (*Id.*). Dr. Klein noted that she had no deformity, mass, warmth, or erythema in either knee. (*Id.* at 716). She had an antalgic gait, swelling, moderate tenderness, and moderate pain at extreme limits of range in the left knee. (*Id.*). Dr. Klein assessed that she had medial/lateral meniscal tears in the left knee, for which he recommended arthroscopy because "conservative measures" had not been successful. (*Id.*).

On January 17, 2017, Burr had her one-year follow-up appointment with Dr. Pajak. (*Id.* at 726). She reported that her condition had not changed, her fibromyalgia was stable, she was experiencing chronic knee pain and awaiting knee replacements, and she was experiencing stress due to her daughter's death and her brother's deployment to Syria. (*Id.*). She also reported "arthralgias/joint pain" in both knees, but reported no muscle weakness, back pain, swelling in the extremities, fatigue, arm pain on exertion, cough, wheezing, shortness of breath, weakness, tingling, shooting pain, or depression. (*Id.* at 728). On examination, she ambulated normally and appeared healthy, well-nourished, and well-developed. (*Id.*). She had normal breathing, good air movement, and no dyspnea. (*Id.* at 729). Dr. Pajak assessed that she had NSAID-induced proteinuria and fibromyositis, which he noted was stable and for which she was using turmeric and BioFreeze spray. (*Id.*). She was still smoking. (*Id.* at 728).

On January 31, 2017, Burr had a follow-up appointment with Dr. Egan for lower back pain and fibromyositis. (*Id.* at 730). She reported that her feet were worse, her knee was worse post-injection, her hands and feet "lock up," and she used a cane. (*Id.* at 732). She also reported

exercise intolerance and "arthralgias/joint pain." (*Id.* at 733). She noted that she expected to have knee surgery once she moved to a first-floor apartment, which "depend[ed] on getting disability." (*Id.* at 732). Dr. Egan found her to be in "moderate distress." (*Id.* at 733). He noted that her left knee was "very tender" and that her right knee and feet were tender. (*Id.*). She had normal muscle strength and tone. (*Id.*). Dr. Egan assessed osteoarthritis of the knee, which required surgery; degenerative joint disease of the hand, for which he recommended that she avoid NSAIDs and apply heat and gentle range of motion; lower back pain; and fibromyositis, which remained active and for which medication treatment remained limited. (*Id.*).

C.    **RFC and Related Opinions**

On April 22, 2016, Dr. Martin, in a verification-of-disability form and EAEDC medical report for the New Bedford Housing Authority, opined that Burr was disabled and required a first-floor apartment or elevator access. (*Id.* at 495-96).[4] He also indicated that she had a "physical, mental health, or cognitive impairment(s) affecting . . . her ability to work [and] the impairment(s) is expected to last" more than a year. (*Id.* at 496).

On June 2, 2016, the state agency reviewer at the initial stage, Jane McInerny, M.D., concluded that Burr was not disabled and had the following residual function capacity: she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or foot controls) an unlimited amount. (*Id.* at 110-21, 122-33). The reviewer also found that she was able to occasionally climb ramps/stairs, balance, stoop, kneel,

---

[4] EAEDC is the Massachusetts Emergency Aid to the Elderly, Disabled, and Children program. (A.R. at 35). Dr. Martin's handwritten date on the EAEDC report is difficult to discern. The parties agree that the correct reading of the date is April 22, 2016. (Def. Mem. at 6; Pl. Mem. at 4).

crouch, and crawl, but could not climb ladders/ropes/scaffolds and had certain postural and environmental limitations. (*Id.* at 118, 130).

On August 9, 2016, Dr. Martin completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (*Id.* at 418-25).[5] He opined that Burr could lift and carry up to ten pounds occasionally; sit, stand, or walk for ten minutes at a time each, and for each a one-hour total daily; reach, handle, finger, feel, or push/pull occasionally with each hand; occasionally operate foot controls with each foot; occasionally stoop, balance, or climb stairs and ramps; never kneel, crouch, crawl, or climb ladders or scaffolds; occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, dusts/orders/fumes/pulmonary irritants, extreme cold, extreme heat, and vibrations; and never tolerate unprotected heights. (*Id.*). He also opined that she could ambulate without using a wheelchair, walker, or two canes/crutches; could climb a few steps at a reasonable pace with the use of a single handrail; and could prepare a simple meal and feed herself. (*Id.* at 423). He further opined that she could not go shopping, travel without a companion for assistance, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, care for personal hygiene, or sort/handle/use paper/files. (*Id.*)

On September 6, 2016, the state agency reviewer on reconsideration, Eduardo Haim, affirmed Dr. McInerny's opinion. (*Id.* at 136-50, 151-65).

### D.    Procedural Background

Burr applied for SSDI and SSI benefits on April 15 and May 17, 2016, respectively, alleging that she became disabled on December 27, 2015. (*Id.* at 267-68, 277-86). The Commissioner denied her application both on initial review and after review by a federal

---

[5] Dr. Martin's handwritten date on this statement is also difficult to discern, but the parties agree that the correct reading of the date is August 9, 2016. (Def. Mem. at 7; Pl. Mem. at 4).

9

reviewing official.  (*Id.* at 166-71, 177-82).  She requested an administrative hearing, which an

Administrative Law Judge ("ALJ") held on August 17, 2017.  (*Id.* at 183-84, 200, 207).  Because

of a problem with the record of the initial hearing, the ALJ held another hearing on November

30, 2017.  (*Id.* at 62-84, 230, 237).  Both Burr, who was represented by counsel, and a vocational

expert testified at the hearing.  (*Id.* at 62-84).

The ALJ issued his decision on February 27, 2018, concluding that Burr was not

disabled.  (*Id.* at 11-20).  She requested review of the ALJ's hearing decision by the Appeals

Council.  (*Id.* at 27-28, 260-65).  On October 1, 2018, the Appeals Council declined to review

the decision, rendering the ALJ's opinion the final decision of the Commissioner.  (*Id.* at 1-4).

Burr filed the complaint in this action on November 14, 2018.

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final

decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C.

§ 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be

conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable

minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ,"

*Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Secretary

of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review

of a Social Security Claim is limited to determining whether the ALJ used the proper legal

standards, and found facts based on the proper quantum of evidence."  *Ward v. Commissioner of

Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision when the ALJ ignored

evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)

("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the

law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D.

Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may

reverse or remand such decision . . . .").  Accordingly, if the "ALJ failed to record consideration

of an important piece of evidence that supports [the claimant's] claim and, thereby, left

unresolved conflicts in the evidence, th[e] Court can not conclude that there is substantial

evidence in the record to support the Commissioner's decision."  *Nguyen v. Callahan*, 997 F.

Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass.

1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the

administrative decision is based on substantial evidence requires a remand to the ALJ for further

explanation.").  Questions of law, to the extent that they are at issue in this appeal, are reviewed

*de novo*.  *Seavey*, 276 F.3d at 9.

###    B.    Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless she is "disabled" within the

meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(E), (d) (setting forth the

definition of disabled in the context of SSDI); 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (same in the

context of SSI).  "Disability" is defined, in relevant part, as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than" 12 months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A).  The impairment must be severe enough to prevent a claimant from performing

not only past work, but also any substantial gainful work existing in the national economy.  42

U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[1] "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's residual functional capacity in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether the claimant can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

C.     **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4) but concluded that it was unnecessary to proceed past the fourth step.

At the first step, the ALJ found that Burr had engaged in substantial gainful activity from

---

[1] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

December 27, 2015, through March 2016. (A.R. at 13). Specifically, the ALJ determined that she had worked as a personal care attendant, earning $29,383 in 2015 and $3,772 in the first two quarters of 2016. (*Id.*). The ALJ also noted, however, that there had been a continuous 12-month period during which she did not engage in substantial gainful activity. (*Id.* at 14). Accordingly, the ALJ's remaining findings addressed the period during which she did not engage in substantial gainful activity. (*Id.*).

At the second step, the ALJ addressed the severity of Burr's impairments. (*Id.*). He concluded that she had the following severe impairments: fibromyalgia, COPD, osteoarthritis of the feet, and mild left knee degenerative joint disease. (*Id.*). By contrast, he concluded that her depressive disorder did not constitute a severe impairment, because it "does not cause more than minimal limitation in [her] ability to perform basic mental work activities . . . ." (*Id.*). In arriving at that conclusion, the ALJ considered her own statements and the medical evidence to evaluate "the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments." (*Id.*); *see* 20 C.F.R. Part 404, Subpart P, Appendix 1.

At the third step, the ALJ determined that Burr's severe impairments did not meet the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16). Specifically, he found that the severity requirement of Listing 1.02 (major dysfunction of a joint) was not met because the record did "not document inability to ambulate effectively as a result of impairment of a weight-bearing joint as required by" Listing 1.02. (*Id.*). In addition, despite the lack of any specific listing for fibromyalgia, the ALJ considered it in conjunction with the listings of musculoskeletal impairments. (*Id.*). He concluded that the severity requirements were not met, however, because there was no evidence that she was unable to

ambulate or perform fine and gross movements effectively. (*Id.*). Finally, given Burr's COPD, the ALJ considered Listing 3.02 (chronic respiratory disorders) but concluded that the severity requirement was not met because her spirometry test from April 2016 indicated an FEV1 value of 1.23 liters, whereas Listing 3.02 requires an FEV1 value of 1.05 or less for an individual of her age and height. (*Id.* at 16; *see id.* at 513-15). [6]

At the fourth step, the ALJ considered Burr's "residual functional capacity and [her] past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ reviewed her medical records, her testimony, and the opinions of state agency medical consultants. (A.R. at 17-19). Among the evidence, the ALJ gave "little weight" to Dr. Martin's opinions as set forth in (1) the verification-of-disability form and EAEDC medical report for the New Bedford Housing Authority (Ex. B2F), and (2) the "medical source statement of ability to do work-related activities" (Ex. B8F). Based on the understanding that the documents were from 2011, "pre-dat[ing] the alleged onset date" of Burr's claimed disability, the ALJ found that Dr. Martin's opinions in those documents had "little probative value." (*Id.* at 19). The parties agree that the correct year for both documents is in fact 2016. (*See* Def. Mem. at 6-7; Pl. Mem. at 4).

The ALJ determined that "the record [did] not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by [Burr]." (*Id.* at 17). He concluded that she had the following residual capacity:

> [T]o lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk 6 hours in an 8 hour workday. She can sit for six hours in an eight hour workday. She can stand and/or walk for four hours in an eight-hour workday. She can occasionally climb stairs and ramps, but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, crouch, kneel, and crawl. She must avoid concentrated exposure to unprotected heights, extremes in hot and cold

---

[6] An individual's FEV1 (forced expiratory volume in one second) value indicates the amount of air she can forcefully exhale in one second. Doctors frequently use this value, along with other data, to measure the severity of a patient's COPD. *See Stages of COPD: Mild through End-Stage COPD*, LUNG INSTITUTE (Feb. 10, 2018), https://lunginstitute.com/blog/stages-of-copd-mild-through-end-stage/ (archived at https://perma.cc/6L4H-TCF2).

temperatures, humidity, and pulmonary irritants such as dust, fumes, odors, and
gases.

(*Id.* at 16).  The ALJ found that, consistent with the Dictionary of Occupational Titles and the

vocational expert's opinion, she could perform past relevant work as a "CAD Designer,

Transcriptionist, and Personal Care Attendant."  (*Id.* at 19).  Because she had a residual

functional capacity to perform her past relevant work, the ALJ concluded that she was not

disabled within the meaning of the Social Security Act.  (*Id.* at 20).

### D.    Plaintiff's Objections

Burr raises the following four objections to the ALJ decision:  (1) that the ALJ erred in

rejecting and/or ignoring the opinions and findings of her treating physicians; (2) that the ALJ

failed to address the impact of her proteinuria and severe reactions to medications on her ability

to treat her symptoms; (3) that the ALJ should have found that she was disabled, given the effect

of all of her impairments; and (4) that she is unable to perform work due to her severe medical

impairments and has an extremely limited residual functional capacity.  Because the Court

concludes that remand is appropriate based on the ALJ's treatment of Dr. Martin's opinions, it

will not reach the remaining issues.

A treating physician's opinion on the nature and severity of an applicant's impairments is

given "controlling weight" when it "is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record . . . ." 20 C.F.R. § 404.1527(c)(2).  If an ALJ does not afford controlling weight

to a treating source's opinion, the judge must consider the length, nature, and extent of the

treatment relationship, the opinion's supportability and consistency with the record as a whole,

whether the treating source specializes in the area, and any other factors brought to the attention

of the ALJ by the parties.   20 C.F.R. §§ 404.1527(c)(1)-(6).  The ALJ must also provide "good

reasons" for the weight ultimately assigned to the opinion. 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ considered the opinions of Burr's treating physicians. (A.R. at 18-19). The ALJ did not, however, give controlling weight to the findings of Dr. Martin, her primary-care physician, in Exhibits B2F (the August 9, 2016 report) and B8F (the April 22, 2016 report). (*Id.* at 19). Exhibit B2F is the medical source statement addressing Burr's ability to perform work-related activities. (*Id.* at 418-25). Exhibit B8F consists of a verification-of-disability form and EAEDC medical report that Dr. Martin completed as part of Burr's application for housing assistance. (*Id.* at 495-98).

Dr. Martin's handwritten date in both exhibits is difficult to discern. As noted, the ALJ misread the handwritten year on each document as 2011. The parties agree, however, that the correct reading is 2016. (*Compare* A.R. at 19 *with* Def. Mem. at 6-7; Pl. Mem. at 4). The ALJ gave "little weight" to Dr. Martin's opinions in Exhibit B2F in part because he believed the statements were from "August 9, 2011, approximately four years prior to alleged onset date" of Burr's disability. (A.R. at 19). Similarly, the ALJ gave "little weight" to Dr. Martin's opinions in Exhibit B8F because he thought the statements were from "April 22, 2011," which "pre-dates the alleged onset date and [thus] has little probative value in the current case . . . ." (*Id.*). Both those dates are wrong, and thus the ALJ's conclusions as to the probative force of those opinions are based in substantial part on a false premise.

The ALJ's errors could nonetheless be harmless if Dr. Martin's opinions were "inconsistent with the other substantial evidence in [Burr's] case record . . . ." *See* 20 C.F.R. § 404.1527(c)(2). The ALJ indeed explained that he afforded "little weight" to Dr. Martin's opinions in Exhibit B2F not only because he believed the opinions were from 2011, but also because he found them "not consistent with the mild clinical findings documented in [Dr.

Martin's] own treatment notes or in the other objective evidence."  (A.R. at 19).  In particular, he noted that Dr. Martin's assessment "that [Burr] is unable to sit, stand, and/or walk for more than one hour in a workday or reach, handle, finger, feel, push, or pull is inconsistent with his observation during office visits that she has normal gait and strength, with normal movement of the extremities . . . ."  (*Id.*).  He also found that assessment to be "inconsistent with [Burr's] abilities to work at a substantial gainful activity level in 2011, 2012, 2013, 2014, 2015 and for a quarter in 2016 . . . ."  (*Id.*).

Dr. Martin's assessment in Exhibit B2F as to Burr's functional capacity is not necessarily inconsistent, however, with his and other physicians' treatment notes.  *See* 20 C.F.R. § 404.1527(c)(2).  First, Burr's treating physicians assessed various impairments that could reasonably render her "unable to sit, stand, and/or walk for more than one hour in a workday or reach, handle, finger, feel, push, or pull."  The record contains multiple instances documenting various physical restrictions and limitations and supporting Dr. Martin's assessment.  Second, it is incorrect that Dr. Martin's assessment is "inconsistent with his observation during office visits that she has normal gait and strength, with normal movement of the extremities," because Dr. Martin did not appear to have made any such observations in any medical notes in the record. (A.R. at 19).  And the fact that Burr may have had "normal gait and strength" or "movement of extremities" during examinations at some of her other medical appointments, (*id.* at 19), does not necessarily contradict Dr. Martin's opinion as to her inability to perform certain tasks for more than one hour in a workday.  Furthermore, in contrast to the ALJ's statement that "there is no evidence of antalgic gait," (*id.* at 18), the record indicates that another treating physician, Dr. Klein, in fact observed an antalgic gait on October 5, 2016.  (*Id.* at 716).  Third, her knee pain and instability—induced at least in part by medial/lateral meniscal tears, as indicated by an

MRI—were severe enough to warrant surgery. (*Id.* at 716, 732). Finally, the ALJ points to various physical examinations from dates prior to her alleged onset date (some as far back as 2012). It is unclear whether the observations made at those visits have substantial probative value as to the "frequency, duration or severity" of her impairments at the time of her onset date in December 2015.

Similarly, Dr. Martin's opinions in Exhibit B2F do not appear to be "inconsistent with [Burr's] abilities to work at a substantial gainful activity level in 2011, 2012, 2013, 2014, 2015 and for a quarter in 2016." (*Id.* at 19). The ALJ noted that in the "2013 hearing associated with her prior application, [she] testified that she was unable to work, yet the earnings record reflects earnings in excess of substantial gainful activity levels in 2013, 2014, and 2015." (*Id.* at 17). The ALJ at the 2013 hearing, however, determined that she "had *not* engaged in substantial gainful activity since May 14, 2010." (*Id.* at 90) (emphasis added). He concluded that while she had engaged in work activity, it "did not rise to the level of substantial gainful activity." (*Id.*). Furthermore, Burr alleges that the onset date of her disability was in December 2015, when her various impairments significantly worsened. (*Id.* at 143, 158). Thus, even if she engaged in substantial gainful activity *before* December 2015, it would not appear to contradict Dr. Martin's opinions about her limited capabilities *after* that onset date.

The ALJ's analysis of Burr's employment between December 2015 and March 2016 is also at least potentially problematic. He noted that she "continued to work at substantial gainful activity level after her alleged onset date, despite her allegations of debilitating symptoms." (A.R. at 19). He did not, however, address her statements that during that period she had hired other PCAs to care for her mother and that she reduced her work hours to ten per week. (*See* A.R. at 70, 322-23, 407). The ALJ also did not address her statement that her income for the

period of February 2 to 20, 2016, was in the form of sick pay.  (*See id.* at 319, 321, 323).  It is unclear whether he considered those circumstances, including the particular tasks she performed, in determining whether she had actually engaged in "substantial gainful activity" from December 2015 to March 2016.  *See* 20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*  And her hiring of another PCA to care for her mother and the reduction of her own work hours could have been an "unsuccessful work attempt" that does "not show that [she is] able to do substantial gainful activity." *See* 20 C.F.R. § 404.1574 ("We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt.  Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity.").  Thus, the ALJ may not have properly considered whether she engaged in "substantial gainful activity" between December 2015 and March 2016.  *See* 20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*

The ALJ also may have unduly discounted Dr. Martin's opinions in Exhibit B8F (the EAEDC medical report).  In considering the exhibit, the ALJ noted Dr. Martin's opinion that Burr "had an impairment that affected her ability to work and that the impairment was expected to last more than a year."  (A.R. at 19).  The ALJ conceded that "the current record does document the presence of severe impairments . . . ." (*Id.*).  However, because he believed the statement was made prior to the onset date, he concluded that it had "little probative value in the current case as indicated above" and therefore gave Dr. Martin's statement "little weight."  (*Id.*).  It is unclear whether the ALJ considered whether Dr. Martin's statements in the exhibit were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record . . . ." *See* 20 C.F.R. § 404.1527(c)(2).

The ALJ is not required to state expressly how he considered each piece of evidence. Nonetheless, he is required "to provide 'good reasons' for his decision to give each treating source's opinion the weight he did and these reasons 'must be sufficiently specific to make [it] clear to any subsequent reviewer.'" *Kelley v. Berryhill*, 2018 WL 4323820, at *11 (D. Mass. Sep. 10, 2018) (citation omitted); *see also Heckler*, 638 F. Supp. at 385-86 ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."); 20 C.F.R. § 404.1527(c)(2).

Under the circumstances, the Court concludes that remand is warranted. The Court expresses no view as to what weight, if any, should be afforded to the opinions of Dr. Martin, or the merits of the claim generally. The Court finds it unnecessary to address Burr's remaining objections.

## III.    Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED. This matter is hereby remanded to the Social Security Administration for further proceedings.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 16, 2019                    United States District Judge